withdrawn.) A.—I had forgotten his true condition. Q. 3279—Had you forgotten that he had any connection with this stock? A.— My impression was that he had obtained possession of a certain amount of the 210 shares of stock, but I had quite forgotten the particular circumstances under which he had obtained it. Q. 3280—Question repeated. (Objected to on the ground that the question has been fully answered previous to today; that the witness had testified also previous to today; that Mr. Hyde had some connection with the stock, and that the last answer is a full and responsive answer to the question. Witness declines to answer further by advice of his counsel.) Q. 3281—Would it be possible for you now to remember what your feelings were at the time the advances were made as stated in your answer to question 3176, and at the same time to forget the main features of the transaction? (Question and answer here read to witness, being as follows: 'Q. 3176—In saying that you agreed to pay the assessments on the American Telegraph stock, and did pay those assessments to a certain extent, do you refer to your understanding that the moneys paid by you on the Vail line should be passed to the credit of that stock? A. Yes. I felt at the time that I was advancing money on account of the Vail line; that I was substantially paying the assessments on the 210 shares of stock for which I was responsible through Mr. Hyde, although the money may not have been, and I think was not actually entered on the books of the company to the credit of that stock.' ·Question 3281 objected to as incompetent, improper, irrelevant and impertinent, and as ambiguous, and as harassing the witness. Witness declines to answer.) * * * Q. 3290—How much was paid to Mr. Croome and Mr. Brown, and when? (Objected to so far as it regards how much was paid, the witness having testified on his cross-examination that about $2,000 was paid to each. Witness declines to answer as to that part.)"

I further certify that in the same proceedings Helena Craig, the wife of said bankrupt, was examined as a witness before me at the instance of said creditor, and that the following is a summary of the evidence upon the points to be submitted to the court: The said Helena Craig on her examination testified as follows: "Q. 3575—Do you mean to say that you paid $6,000 for the entire property (State St. property)? A.—There was a mortgage on the property when I bought the lots. I paid between $12,000 and $13,000 for the property; that includes the mortgage upon the property which I afterwards paid. Q. 3576—Was there any mortgage on the property at the time you procured the subsequent mortgage on the property? (Question objected to. Question to be certified.) Q. 3577—After your purchase of the property, did you give a mortgage upon it? A.—I did. Q. 3578—To whom? (Objected to.) A.—To Mr. Corning

for $7,000. Q. 3579—Did you use that money to pay off the first mortgage? A.—No, sir. Q. 3580—What did you use that money for? (Objected to. To be certified.) Q. 3603—Now please state the reason if you know, why the conveyance of this property was first made to your husband and not to yourself? (Question objected to.)"

[NOTE. For the examination of Helena Craig, wife of the bankrupt, see Case No. 3,324, next following.]

---

## Case No. 3,324.

### In re CRAIG.

[4 N. B. R. (Quarto) 52.][1]

District Court, S. D. New York. Oct. 18, 1870.

#### EXAMINATION OF BANKRUPT.

[On certificate of register in bankruptcy.

[In the matter of Daniel H. Craig.

[For prior examinations of the bankrupt, see Cases Nos. 3,322 and 3,323.]

It is understood that all questions objected to on this examination are to be certified to the court, if either party desires.

By Odle Close, Esq., Register in Bankruptcy.

Mrs. Helena Craig, being produced as a witness and sworn on behalf of Mahlon Vail, creditor, testifies as follows: "Q. 3718. How much money was due to you from the American Telegraph Co.? I ask you how much? A. I do not recollect. Q. 3719. Do you recollect approximately? A. I do not know. Q. 3720. Can you state within five thousand dollars? A. 1 cannot. Q. 3721. Within ten thousand dollars? A. I cannot. Q. 3722. Who paid you the money due you from the American Telegraph Co.? Who paid you these lease monies due from the American Telegraph Co.? (Objected to by Mr. Ensign.) Q. 3723. Did you receive any money at all from the American Telegraph Co. for this lease interest? A. No, sir, not to my recollection. Q. 3724. What became of the third interest that you had in the Commercial Telegraph Line which you say you derived from Mrs. McKinney? A. Sold it to the American Telegraph Co. for stock, or exchanged it. Q. 3725. And did the interest you had in the first American Telegraph Co. go into the second telegraph company? A. Yes, sir. Q. 3726. Did all that interest go in the Western Union Co.? A. I do not know that I have had any interest in the Western Union Co.; not to my knowledge I did not. Q. 3727. What became of the stock which stood in your name in the second American Telegraph Co.? (Objected to by Mr. Ensign.) Q. 3728. Did you sell the stock which you held in the American Telegraph Co. to any one? A. I had it sold. Q. 3729. In what way was it sold? (Objected to by Mr. Ensign.) Q. 3730. To whom was it sold? (Objected to by Mr. Ensign.) Q. 3731. Did you

[1] [Reprinted by permission.]

know personally what was paid on the sale? A. I do if I understand the question. Q. 3732. Did you personally receive the money? A. Yes, sir, I did. Q. 3733. But you did not receive it you say from the person you bought it from? A. No, sir. Q. 3734. From whom did you receive it? (Objected to by Mr. Ensign.) Q. 3735. Who negotiated the sale? (Objected to by Mr. Ensign.) Q. 3736. Did your husband, to your knowledge, receive or at any time have in his possession any of the proceeds of such sale? A. He had it long enough to bring it home to me; never held it at any other time. Q. 3737. How long did he have it? A. From the time he received it until he delivered it; it might have been in a day or two. Q. 3738. Did he not have some of it longer than a week? A. No, unless he held it to pay some bill or obligation. Q. 3739. Did or did not he hold some of it longer than one week? A. I have answered that. Q. 3740. In what form did he give it to you? (Objected to by Mr. Ensign.) Q. 3741. Did you receive it in the form of bank bills or checks? (Objected to by Mr. Ensign.) Q. 3742. How much did you receive? How much did he give you? (Objected to by Mr. Ensign.) Q. 3743. Did he give it to you in more than one payment at a time? (Objected to by Mr. Ensign.) Q. 3744. Where did he give it to you? (Objected to by Mr. Ensign.) Q. 3745. What did you do with the money after he gave it to you? (Objected to by Mr. Ensign.) Q. 3746. Did you deposit any of the money after he gave it to you? (Objected to by Mr. Ensign.) Q. 3747. Did you pay back the same to him with any of the money after you first received it from him? A. I have loaned him money, but I cannot recollect whether it was that or other monies. Q. 3748. Did you loan him any money subsequent to the time you received this money? A. I do not recollect. Q. 3749. In what year did you receive this money? A. In 1866 or 1867. Q. 3750. Was not all received as late as 1868? A. No, sir. Q. 3751. How did you know that the monies which you say that you received from your husband were the avails of this stock? (Objected to by Mr. Ensign.) Q. 3752. Do you know of any other way except by information received from him? (Objected to by Mr. Ensign as improper and irrelevant.) Q. 3753. Have you had any settlement with your husband for any of the monies you have loaned him? A. I do not understand you. Q. 3754. Have you had any settlement with him? A. No formal settlement. We generally settled as we went along. When a transaction was accomplished, it needed no further settlement than that. Q. 3755. Did he always repay you the money which you loaned him? A. No, sir. Q. 3756. In what way, then, have you had a settlement with him? A. I considered his services in lieu of the money, and we settled in that way. Q. 3757. What services? A. Acting as my agent in business transactions. Q. 3758. Did you ever

have any settlement made by and between you of the various amounts you have loaned him? A. No. Q. 3759. When did you make the last loan of money to him? A. Three or four months ago. Q. 3760. How much? (Objected to by Mr. Ensign as being after the date of filing his petition.) Q. 3761. When was the last loan you made to him prior to December, 1868? A. I don't recollect. Q. 3762. About long previous to that time? A. I don't recollect. Q. 3763. Cannot you tell within five years? A. I loaned him money whenever he wanted it. I cannot tell the time. Q. 3764. Can you not tell within five years prior to December, 1868, when you made the last loan of money to your husband? (Objected to by Mr. Ensign.) Q. 3765. What was the amount of money you last loaned your husband prior to December, 1868? A. I don't recollect. Q. 3766. Can't you state within five thousand dollars? A. I don't recollect. Q. 3767. What amount of money in all have you loaned your husband from 1857 to the 1st of December, 1868? A. About twenty thousand dollars, to the best of my recollection. Q. 3768. Did you ever take from your husband any notes or vouchers for such loans to him? A. No. Q. 3769. Did you ever keep any book of accounts yourself? A. No, merely pencil memorandums. Q. 3770. Have you any of those pencil memorandums now? A. I may and I may not; I probably have not got any. (Mr. Olmstead requested the witness to produce them.) Q. 3771. Who was in the habit of collecting your dividends on stock which you held in the first and second American Telegraph Co.? A. My husband, unless Mr. Eddy brought it to me at the house, which he sometimes did. Q. Was your husband in the habit of bringing your dividends to you? A. Yes, sir. I presume they gave them to him at the office to bring to me. Q. 3772. You were in the habit of receiving them from him, were you not? A. Yes, sir, unless Mr. Eddy brought them to me. Q. 3773. Did or did not your husband know of the sale of the stock which you held in the second American Telegraph Company at the time the sale was made? (Objected to by Mr. Ensign.) Q. 3774. Did your husband not know? A. He knew. Q. 3775. Do you know whether your husband did or did not know from what source you derived the stock which you held in the first and second American Telegraph Company? (Objected to by Mr. Ensign on the grounds of incompetent, improper, and irrelevant.) Q. 3776. Did or did not your husband know what use you made of the proceeds of that stock after its sale? (Objected to by Mr. Ensign.) Q. 3777. In what way did you derive this one-third interest in the Commercial Line from Mrs. McKinney? A. She gave it to me. Q. 3778. Were you acquainted with Mrs. Margaret McKinney? A. Yes, sir. Q. 3779. In her lifetime? A. Yes, sir; an intimate friend. Q. 3780. Is she still alive. O. She is. Q. 3781. Where does she reside? A.

In Scranton, Pennsylvania. Q. 3782. Did she convey that stock to you by any written instrument? A. She did. Q. 3783. Do you recollect on what date? (Objected to by Mr. Ensign.) Q. 3784. Do you recollect about the date? A. She told me formerly, in 1855, she would give it to me, and it was executed in '56 or '57, but I knew it was to be mine two or three years before. Q. 3785. Did you ever pay her anything for the stock for that interest? A. No, sir. Q. 3786. Was she under any moral or legal obligation to convey that interest to you? (Objected to.) Q. 3787. Moral obligation? (Objected to on the ground as a conclusion of law.) A. It was her husband's wish before he died, and she carried out his intentions. Q. 3788. Was there not reason that you know of other than what you have stated here that this interest was assigned to you? A. Mrs. McKinney felt under obligation to my husband, and she gave it to him, and he declined to accept it, and she then offered it to me, and I accepted it. Q. 3789. Have you the instrument making the assignment to you of that interest? A. No, sir. Q. 3790. Did you ever have it? A. Yes, sir. Q. 3791. What did you do with it? A. Gave it to my counsel in another suit. Q. 3792. Who? Please state the counsel's name to whom you gave it. A. Mr. Field. Q. 3793. Which Mr. Field? A. D. D. Field, to the best of my recollection. Q. 3794. When did you give it to him? A. In '56, 7 or 8, along there. I do not recollect the date. Q. 3795. Was the paper which you gave to him an assignment to you from Mrs. Margaret Jane McKinney? A. No, sir. (Objected to.) Q. 3796. What was it? (Objected to. Q. 3797. What instrument did you give to Mr. Field? A. I think it was one from Mrs. Hyde conveying it to me. It was made from Mr. McKinney in the first place, and he conveyed it to me. Q. 3798. Did you ever see the conveyance from Mrs. McKinney to Mr. Hyde? (Objected to as irrelevant.) Q. 3799. Did you ever have possession of the assignment to Hyde from Mrs. McKinney? A. I don't recollect. I had possession of the conveyance from Hyde to me, but to the best of my belief I never had it. Q. 3800. If Mrs. McKinney desired to make the assignment to you, state if you know why it was first made to Hyde? A. At my request. Q. 3801. Why did you request it? A. He had led me to believe that he could sell it to a better advantage than I could. Q. 3802. Was not the assignment from Hiram Hyde to you as late as March, 1858? A. I think not, but I cannot remember the date. I believe I stated '56, 7 or 8. Q. 3803. It may have been as late as '58? A. It may have been, but I think not. Q. 3804. Would you recognize a copy of the assignment from Hyde to you to which you have referred? (Objected to as incompetent and improper.)

"(Paper handed to witness, and marked 'Creditors' Exhibit I, January 20, 1870.' Mr. Ensign withdraws his objection.) A. To the best of my knowledge and belief, it is a copy. Q. 3805. Did you afterwards, together with your husband, make an assignment of this same interest, or any part of it, to the American Telegraph Company? (Objected to.) Q. 3806. If you did, state as near as you can recollect the date of the assignment, and whether it was in writing? (Objected to by Mr. Ensign.) Q. 3807. What amount of consideration, if any, did you receive on such assignment, if the assignment was made? A. I received stock in the American Telegraph Company for the third interest. Q. 3808. Did you receive any money? A. No, sir. Q. 3809. Did your husband, to your knowledge, receive any money on such assignment, money or consideration? A. Not to my knowledge. I don't think he did; I don't believe he did. Q. 3810. How much stock did you receive? A. I answered that question the last time I was here. I answered it before. I received the 210 shares and paid what was due in cash; whatever my interest would not liquidate I paid in money. Q. 3811. How much cash did you pay? A. I don't recollect; a trifling sum, if any. Q. 3812. What reason was there, if any, for your husband joining with you in that assignment to the American Telegraph Company? A. Mr. Eddy requested it, saying that it was customary for the husband to sign when the wife was conveying her interest, and in addition to this Mr. Craig had laid claim to this interest in some difficulty with Mr. Spear and Mrs. McKinney. Q. 3813. Did you never recognize Mr. Craig's claim to this interest? (Objected to as irrelevant.) Q. 3814. Did you, at any time about the year '59, together with your husband, execute a bond to the American Telegraph Company? A. I don't recollect any such transaction. Q. 3815. Was all the stock which you held in the first American Telegraph Co. converted into stock of the second American Telegraph Co.? A. I don't recollect. Q. 3816. Where did you get your stock in the second American Telegraph Company? A. From the stock bought in the first. Q. 3817. And there was a transfer of your interest, was there not, from the first into the second American Telegraph Company? A. Yes, sir. Q. 3818. Did you transfer the stock yourself from one company to the other? A. Mr. Eddy made out the papers and done whatever was necessary. How it was arranged I do not remember precisely. Q. 3819. Do you recollect of assigning any certificates of stock yourself, personally? A. I signed various papers brought by Mr. Eddy, but I cannot recollect what they were. Q. 3820. Was all the business of the transfers conducted through Mr. Eddy? A. To the best of my recollection they were. Q. 3821. You refer to Mr. James Eddy? A. Yes, sir, then manager of the line, and a personal friend. Q. 3822. Was or was not your husband acquainted with all these various transactions about which you have testified in relation to your interest in these various companies? A. I presume he was,

but he might not have known all of the transactions. Q. 3823. Was he acquainted with the transactions? A. I think he was. Q. 3824. Did or did not your husband attend to the business of these various transfers for you? A. Mr. Eddy attended to that matter for me. Q. 3825. I ask whether your husband did. Did not your husband, jointly with Mr. Eddy, attend to it? A. I don't recollect. Q. 3826. Do you know whether your husband knew what became of the proceeds of the American Telegraph Company's stock on its sale by you? A. Which American Company? Q. 3827. The second. (Objected to as asked before and on the previous grounds.) Q. 3828. Did you ever authorize your husband to subscribe for any of the stock of the first American Telegraph Company in your name or for your benefit? A. He subscribed for 210 shares on his own account, and when I transferred my interest in the line there was no other stock of the American Company, all the rest being subscribed for by other parties, and I took that 210 shares for the payment of my interest in the Commercial Line, together with the other things which I have mentioned in answer to question 3712. Q. 3829. Is that the stock Mr. Hyde subscribed for? A. I don't know which subscribed for it, Mr. Hyde or my husband. Q. 3830. Then all that interest which you had in the first American Telegraph Company was transferred, was it not, to the second American Telegraph Company, on the formation of the second American Telegraph Company? A. Yes, sir; but I had more stock in the second than in the first American Telegraph. Q. 3831. How did you happen to have more stock? A. They watered it. Q. 3832. And it was the increase? A. Yes, sir. Q. 3833. How much was that 210 shares watered? A. I cannot tell how much that particular 210 shares was watered. Q. 3834. How much stock was given to you in the second American Telegraph Company prior to any purchase of the Clark and Woodward stock? A. I had no Clark and Woodward stock. Q. 3835. How much exclusive? (Objected to.) Q. 3836. How much stock of the second American Telegraph Company did you receive for your stock in the first company? A. All the stock I had in the first company. Q. 3837. I am speaking all together. A. Between three and four hundred shares. Q. 3838. How much stock did you own all together in the first American Telegraph Company? A. The 210 shares that I had in exchange for my Commercial Line, and I afterwards bought thirty shares at a sheriff's sale, and after that 120 shares at private sale which I subsequently resold; didn't hold any a great length of time. Q. 3839. Who did you sell the 120 shares to? A. It was sold for me. I don't know who purchased it. Q. 3840. Who sold it for you? A. Mr. Stoker or Mr. Craig; I cannot recollect. Q. 3841. For how much was it sold? A. For a large advance on what I paid. Q. 3842. About

how much? A. I think I paid in the neighborhood of twelve thousand dollars and I got from five to eight thousand advance, I think; I cannot remember the precise increase; that is as near as I can recollect. Q. 3843. Who did you buy that 120 shares of? A. Mr. Cogswell. Q. 3844. Where did you get the money with which you paid for that 120 shares that you bought of Mr. Cogswell? A. I don't recollect whether I paid for it at the time or whether I paid for it afterwards or not. I recollect that I bought it. Q. 3845. The question is where did you get the money with which you bought that stock? A. From funds in my own possession, of course. Q. 3846. Where did you get these funds? A. From my savings. Q. 3847. From the savings of the money which Mr. Craig had given you? A. I did not pay for the stock, I think, until after I sold it. Q. 3848. How did you get the stock, then, without paying for it? A. Borrowed the money, I remember now; borrowed the money to pay for it, and returning it after I had sold it. Q. 3849. From whom did you borrow the money? A. I recollect now; Mr. Olmstead. I have hypothecated other stock. Q. 3850. Who to? A. I don't know the parties. The loan was negotiated for me. Q. 3851. Who negotiated the loan? (Objected to by Mr. Ensign.) Q. 3852. Did Mr. Stoker negotiate that loan? (Objected to.) Q. 3853. What monies did you use in returning the amount of this loan? A. The money arising from the sale of the stock of the 120 shares of the Cogswell stock. Q. 3854. How long did you have the loan? A. I don't recollect. Q. 3855. About how long? A. I don't recollect. Q. 3856. Can you state the precise amount of the loan? A. Yes, sir, I remember now; I raised fifteen thousand dollars at the time. Q. 3857. Did your husband have anything to do about raising that loan for you, about procuring it? A. I asked him to attend to it for me. Q. 3858. Did he? A. I gave him the stock; I don't know whether he raised the money or any one else. Q. 3859. Did he bring you the money? A. I don't recollect. Q. 3860. Do you recollect in what form the money came to you, which was given to you, whether by bills or by check? (Objected to as irrelevant.) Q. 3861. Do you recollect distinctly having received the money yourself, personally? A. I do not know; it may have been paid directly over for the stock, but I am not positive about it. If they were checks I endorsed them and returned them, but I do not recollect. Q. 3862. What monies did you use in payment for the thirty shares of stock that you have mentioned as purchased at a sheriff's sale? A. A few dollars that I had from my dividends that I had from my other stock; it was but a few dollars any how; I don't remember how much. I wish to amend this by saying I don't know what money I used. Q. 3863. Did you pay the par value for that stock? A. No, sir. I paid a few dollars, I told you before. Q. 3864. In what suit

was that sale made by the sheriff? A. It was known as part of the Hyde stock. Q. 3865. Was the stock sold on a judgment in a suit brought by you? A. I think it was. Q. 3866. Against Mr. Hyde? A. I think it was. Q. 3867. Was the 210 shares and the thirty shares of stock in the first American Telegraph Company all the stock which you held at any time in that company? A. To the best of my recollection it was. Q. 3868. How much stock in the second American Telegraph Company was issued to you for that stock in the first American Telegraph Company? A. Between three and four hundred shares, exclusive of the Cogswell stock. Q. 3869. How much of the Cogswell stock did you own? (Objected to on the ground that the witness has already answered.) Q. 3870. Was that between three and four hundred shares of stock in the second American Telegraph Company which you received for your 210 shares and thirty shares held by you in the first American Telegraph Company all the stock that you had in the second American Telegraph Company during its existence? A. To the best of my recollection it was. Q. 3871. And did you hold all that stock in the second American Telegraph Company until its dissolution, until its merging into the Western Union? A. Yes, sir, I held it until 1866. Q. 3872. And then you sold it? A. Yes, sir. Q. 3873. Was an action ever brought against you to recover any stock which you held in either of the companies? A. Not to my recollection. Q. 3874. In whose name did that stock stand which was sold by the sheriff at the time of the sale; in whose name on the books of the company? (Objected to on the ground that the books will show.) Q. 3875. Did or did you not claim to be the owner of that stock which was sold by the sheriff at the time of the sale? A. I claimed to be the owner of some of the stock which Mr. Hyde wrongfully held, but whether that was a portion of it or not I cannot state. Q. 3876. In what suit was that sale made? (Objected to as being asked before.) Q. 3877. When was it sold by the sheriff, in what year? A. I don't recollect. Q. 3878. Was it about the year 1862? A. I don't recollect. Q. 3879. Was it sold on an execution against your husband? A. There was some of my stock taken and wrongfully held by Clark and Woodward, and I paid three thousand to Clark and Woodward to release that stock. Q. 3880. In what way was it held by Clark and Woodward? A. In a judgment against my husband. Q. 3881. Do you know in what court it was recovered; was it in the superior court of this city? A. I don't recollect. Q. 3882. Did you at any time hypothecate the stock held by you in either of the companies you have mentioned to Wilson G. Hunt for the sum of twenty-five thousand dollars or thereabouts? A. I hypothecated my stock at various times and for various circumstances. Of that particular transaction I cannot recollect. Q. 3883. If a trans-action of that magnitude had occurred would you or would you not be likely to remember it? A. I should be likely to remember it if I had a long time to think it over, but for the moment, owing to the state of my health, I cannot think them over. I cannot think of them. Q. 3884. Do you remember receiving about that amount of money at any time from Wilson G. Hunt? A. I cannot recollect. Q. 3885. Did the stock of the first American Telegraph Company during the entire time you held it stand in your name on the books of the company? A. No, it did not. I transferred it at various times and for various purposes, and at one time I transferred the whole amount to my husband, so that he could appear as a large stockholder at the meetings of the company. It was about the formation of the second company. When the new company was formed, instead of re-issuing it to me, they reissued it to him, and it stood so, and I did not discover it for a year or more, and then I left the stock with the company and had it reissued to me. Q. 3886. About what year was that? A. 1857 or 1858, to the best of my recollection; perhaps later than that. I have no distinct recollection of the date. Q. 3887. Have you now stated to the best of your recollection all the persons to whom you have hypothecated any of that stock while you held it? (Objected to. Question withdrawn.) Q. 3888. Do you recollect hypothecating any of the stock of the first or second American Telegraph Company to any person while you held it? (Objected to as being answered before. Mr. Olmstead desires Mr. Ensign to point out where.)

"Q. 3889. Did your husband to your knowledge transfer any of your stock to your brother-in-law, Mr. Croome? A. He did at my request. Q. 3890. Was it a sale or hypothecation? A. Hypothecation. Q. 3891. For how much? A. I don't recollect. Q. 3892. Can you state approximately? A. I cannot. Q. 3893. Can you state within five thousand dollars? A. I don't recollect. Q. 3894. Within ten thousand dollars? A. I don't recollect. Q. 3895. Did you ever repay that money to Mr. Croome? A. Yes, sir, I authorized it paid. I do not know that I paid it personally I received the stock back; it was paid for. Q. 3896. But do you not recollect that you paid it yourself? A. I authorized it paid. That is all I can tell you. Q. 3897. Do you know who negotiated that loan for Mr. Croome? A. I requested my husband to attend to my portion of it, and he did so. Q. 3898. Did you ever transfer any of your stock to James B. Brown? A. I think I did. Q. 3899. Do you know how much? Was it an absolute sale or hypothecation? A. Hypothecation. Q. 3900. Can you tell within five thousand dollars how much was received? A. I cannot. Q. 3901. Did you receive the money yourself on the hypothecation? A. I did from my husband. Q. 3902. Did you personally receive it?

A. I think I did on that occasion. Q. 3903. Can you state when it was? A. I cannot. Q. 3904. Can you state the amount of stock transferred? A. I have answered that question. Q. 3905. Can you state the amount which was received? A. I have answered that. Q. 3906. Did you repay Mr. Brown that money yourself personally? A. I did or my husband did at my request. I furnished the money. Q. 3907. Do you know that your husband did pay? A. I have just told you that I do not know whether he paid it or I paid it. I am not quite sure but I did pay it. Q. 3908. Can you now state the name of any person who brought your money from your brother-in-law in California? Your brother-in-law O. W. Craig, in California? A. I cannot; they were personal friends of his, passing through the city. I never had any personal acquaintance with any of them. Q. 3909. Did you furnish any money or outfit for him when he went to California? A. Perhaps my husband and myself might have furnished two or three hundred dollars in that fitting out, which he afterwards repaid. Q. 3910. Did you pay yourself personally any of it? A. I expended a little money in buying things for his personal comfort on his voyage out. Q. 3911. Did you pay the most or your husband for his outfit? A. I cannot say. Q. 3912. Have you any interest in the New York News Room? A. That is my private business; I decline to state. Q. 3913. If you have any interest, from whom did you receive it? A. That is my private business; I decline to state. Q. 3914. Did you receive your interest in that news room directly or indirectly from your husband? A. I did not. Q. 3915. Did he to your knowledge ever have any interest in that news room? A. Not to my knowledge. Q. 3916. If you have any interest in that news room, what is the amount and character? A. I decline to state, as it is my private business. (Question objected to by Mr. Ensign.) Q. 3917. Is Mr. Stoker interested in that news room? (Objected to.) Q. 3918. Did your husband ever receive, to your knowledge, or pay to you, any of the profits of that news room? A. I do not recollect. Q. 3919. If you have an interest in that news room, how long have you had it? (Objected to by Mr. Ensign). Q. 3920. Did your husband, as agent of the Associated Press, have any connection with that news room? A. I suppose he furnished news. Q. 3921. Did he receive news from it? A. I presume so. I don't know; that is his private business, not mine. Q. 3922. Did the news room or the association having that room pay him any monies during the time he was agent for the Associated Press? A. I don't know. Q. 3923. Did you ever pay any monies for any interest in that news room? A. No, not that I recollect. Q. 3924. Do you know whether you did or not? A. To the best of my knowledge and belief I did not. Q. 3925. How did you become a stockholder in that association without paying any money? A. That is my private business; I decline to answer. Q. 3926. Did you ever hold any interest in the Cape Cod Telegraph Line? A. I never owned any. Q. 3927. Did not Mr. Croome, your brother-in-law, furnish money with which to buy an interest in this line for you? A. I don't recollect. Q. 3928. Did you ever have any stock in that line? A. I do not recollect. Q. 3929. Did you ever at any time have any interest or stock in the telegraph line known as the Cape Ann Line? A. No, sir. Q. 3930. Did you ever have any stock or interest in the English cable line or in the Atlantic Telegraph Company? A. I believe I had a little. Q. 3931. How much? A. I think five pounds, somewhere along there, but I cannot recollect how much. Q. 3932. Where did you get it? A. Bought it, I suppose. I have no recollection only that I had it. Q. 3933. Did you ever have any interest in the New York, Newfoundland and London Telegraph Companies? A. Yes, sir. Q. 3934. What amount of interest? A. I had a hundred shares. Q. 3935. What was its value? A. Not a great deal at the time I bought it. Q. 3936. How much per share was it on its par value? A. I don't recollect, I only know that I bought it. Q. 3937. Who did you buy it from? A. Mr. Hyde, I think. Q. 3938. How much did you pay for it? A. I don't recollect. Q. 3939. About how much? A. I don't recollect; I know what it sold for. Q. 3940. Can you state within a thousand dollars what you paid for it? A. I cannot. Q. 3941. Within five thousand dollars? A. I cannot. Q. 3942. Did your husband negotiate the purchase for you? A. I empowered him to buy it. I don't know whether he did or got some one else to do it. Q. 3943. Where did you get the money with which you bought that stock? A. Borrowed it. Q. 3944. From whom? A. Hypothecating other stock. Q. 3945. From whom did you borrow it? A. I do not know. Q. 3946. Did you attend personally in negotiating the loan? A. No, sir. Q. 3947. Was it done by your husband? A. Yes, sir. Q. 3948. Was this stock attached during that controversy that you had with Mr. Hyde? A. I don't recollect. Q. 3949. What became of that stock? A. I had it sold for the benefit of my husband. Q. 3950. What was realized on the sale? A. I think about ten thousand dollars. Q. 3951. Did you give the money to your husband? A. Yes, sir. Q. 3952. How long ago was that? A. I don't recollect that. Q. 3953. About how long? A. I don't recollect how long ago it was. Q. 3954. Within four or five years? A. I cannot say, my head aches so. Q. 3955. Did you ever receive any of the proceeds yourself? A. Yes, sir, he paid some small bills of mine out of it. Q. 3956. Do you know who has that stock now? A. I do not. Q. 3957. Please state what interest you have, if any, in the Redfield and Rice Manufacturing

Company. If so, state from whom you derived the money you put into this company; whether you are a director of the company; how much stock. if any, you own in the company; how much was your original interest, if any, and how much your present interest is, if any. A. I consider that my private business, and decline to answer any, except that my husband has no 'direct' or 'indirect' interest in the matter. Q. 3958. Was any of the money which was put into this company by you derived from the sale, hypothecation, increase, or dividends of either of the American Telegraph Companies? (Objected to as irrelevant by Mr. Ensign.) Adjourned until· February 3, 1870."

The counsel for said Mahlon Vail requests that said bankrupt be required to answer the questions above numbered 1042, 1043, 1051, 1034, 1039, 1040, 1751, 1752, 2221, 2225, 3219, 3260, 3261, 3262, 3278, 3279, 3280, 3281, 3290. And said counsel also requests that said Helena Craig be required to answer the questions above numbered 3576, 3580, 3603, 3722, 3727, 3729, 3730, 3734, 3735, 3740, 3741, 3742, 3743, 3744, 3745, 3746, 3751, 3752, 3764, 3773, 3775, 3776, 3783, 3786, 3787, 3798, 3805, 3806, 3813, 3826, 3852, 3860, 3888, 3912, 3913, 3914, 3915, 3916, 3917, 3919, 3925, 3957, 3958. I am of opinion that the several questions were all pertinent and proper.

BLATCHFORD, District Judge. I concur with the register in his opinion. The clerk will certify this decision to the register, Odle Close, Esq.

## Case No. 3,325.

### CRAIG'S CASE.

[1 Pet. C. C. 1.][1]

Circuit Court, D. New Jersey. April Term, 1803.

#### PRACTICE.

At an early period, after the organization of the federal courts, the rules of practice, in force in the state courts, which were similar to the English practice, were adopted by the judges of the circuit court. A subsequent change in the practice of the state courts, will not authorise a departure from the rules so adopted in the circuit court. Rule for trial by proviso.

[Cited in Moan v. Wilmarth, Case No. 9,686.]

In an ejectment against Craig, on motion of Mr. Leake for a non pros., unless the cause should be brought to trial at the next term, according to the practice in New Jersey, THE COURT determined that, as at an early period after the organization of the federal courts, the judges of the circuit court had, by a rule, adopted the practice of the state courts, at which time the English practice prevailed, it would be improper to depart from it, in a special case, because the state practice is now changed, without first altering the general rule. According to the

English practice, as used before and at the time the ·general rule was made, the defendant can only move for a rule for trial by proviso.

Mr. Leake then moved, that the plaintiff should file the issue roll, within two months, or to show cause, at the next term, why a non pros. should not be entered.

THE COURT granted the rule, the same being conformable to the English practice.

## Case No. 3,326.

### CRAIG v.· BROWN.

[Pet. C. C. 139.][1]

Circuit Court, D. Pennsylvania. April Term, 1815.

#### ACTION ON BILL OF EXCHANGE—PLEADING AND PROOF.

1. In an action where the declaration stated that E. Brown was attached to answer, and proceeded to allege in his declaration, the drawing of a bill of exchange by Elisha Brown; evidence· of a bill of exchange signed by Elijah Brown, cannot be given in evidence.

2. The plaintiff was allowed to take off a nonsuit and to amend the declaration, on payment of costs.

The declaration recited that E. Brown was attached to answer the plaintiff; and then proceeded to declare against him, as Elisha Brown, on a protested bill of exchange, drawn by him in favour of the plaintiff. At the trial, the plaintiff offered in evidence to support his declaration, a bill of exchange signed E. Brown, and proved the hand writing to be that of Elijah Brown, as the witness had generally heard him called, and did not recollect ever to have heard him called Elisha Brown. The defendant's counsel objected to this evidence, on account of the variance between the proof and the declaration.

Mr. Shoemaker, for plaintiff.

Mr. Chauncey and J. R. Ingersoll, for defendant.

THE COURT sustained the objection; observing that it would be· improper to permit a paper to go to the jury, having the signature of the defendant in the suit, unless it is proved to be his signature, by sufficient evidence. This suit is against Elisha Brown, and the bill of exchange offered in evidence is signed by Elijah Brown.

The plaintiff suffered a nonsuit. He afterwards moved to set aside the nonsuit, and to have leave to amend his declaration, which was allowed by THE COURT, upon his paying the costs.

[NOTE. On the trial, plaintiff suffered a nonsuit. Case No. 3,327. Plaintiff thereafter commenced a new action. Judgment was rendered for defendant on demurrer to the replica-

[1] [Reported by Richard Peters, Jr., Esq.]       [1] [Reported by Richard Peters, Jr., Esq.]